## MALINOWSKI *v.* DETROIT UNITED RAILWAY.

1. CARRIERS—STREET RAILROADS—INJURIES TO PASSENGER—NEGLIGENCE—EVIDENCE—SUFFICIENCY.
   In an action by a passenger against a street-railway company for personal injuries alleged to have been caused by a premature starting of a car while plaintiff was getting on, evidence examined, and *held*, sufficient, though conflicting and containing inconsistencies and contradictions, to support a verdict for plaintiff.

2. WITNESSES—CREDIBILITY—INSTRUCTIONS—PROPRIETY—FALSUS IN UNO FALSUS IN OMNIBUS.
   A requested instruction to the effect that, if a witness is untruthful upon one point, his testimony may be entirely disregarded, is properly modified by the addition of an exception with reference to matters as to which he is corroborated and leaving the truth of the witnesses' testimony entirely to the jury.

3. TRIAL — INSTRUCTIONS — BURDEN OF PROOF — MISLEADING INSTRUCTIONS.
   In an action by a passenger against a street-railway company for personal injuries, an instruction that the jury are the best 12 men to determine the accident, "because of this negligence, as the case may be," of any 12 men in the world, because they have heard more about it, and know the most about it, was not misleading as intimating that defendant's negligence had been established, the court having repeatedly charged that the burden was upon plaintiff to prove defendant's negligence and his own freedom from negligence by a preponderance of the evidence.

Error to Wayne; Donovan, J. Submitted June 4, 1908. (Docket No. 31.) Decided September 10, 1908.

Case by Stanislaus Malinowski against the Detroit United Railway for personal injuries. There was judgment for plaintiff, and defendant brings error. Affirmed.

*Brennan, Donnelly & Van De Mark*, for appellant.

*Dohany & Dohany*, for appellee.

Blair, J. Plaintiff sued defendant to recover for injuries alleged to have been received June 3, 1905, through the negligence of defendant in suddenly starting a Brush street car while plaintiff was boarding the same on Woodward avenue between Fort street and Monroe avenue, in the city of Detroit. In consequence of the accident a wheel of the car ran over and crushed plaintiff's right foot, necessitating the amputation of four toes. Plaintiff recovered a verdict of $1,200. Defendant entered a motion for a new trial, for the reason, among others, that the verdict was against the weight of the evidence. The motion was denied, reasons therefor filed, exceptions properly saved, and defendant brings the record to this court for review upon writ of error.

As stated by counsel for defendant in their brief, the principal point presented to this court is that the trial judge erred in not granting a new trial upon the ground that the verdict was contrary to the weight of the evidence.

Plaintiff testified:

"At that time I was working for the gas company at the meter house on River and Twenty-third streets; was earning $2.25 a day working nights. When I started home the morning of June 3d, I took a Fort street car, and got a transfer on Brush. Got off the Fort street car at Fort and Woodward, close to the city hall—in front of the city hall. I waited for a Brush street car right close to the city hall door. The Brush street car stopped there where I was standing, right opposite the city hall on Woodward avenue. * * * While the car was standing still I tried to get on. I got my right foot on the step. I had hold of the railing with my right hand, and in the other hand I had my lunch basket. While I had my right foot on the step of the car, and my right hand hold of the brace, the car started off. When the car started off I fell off. It cut off four toes, my foot caught."

George M. Kolb, sworn for plaintiff, testified as follows:

"I am a patrolman of the metropolitan police force, and have been for 13 years. I am now, and on June 3, 1905, was, connected with the central station. My beat

on that morning was on Monroe and Cadillac Square. Saw Malinowski on that morning. When I first saw him he had his back to me. I just saw him falling from a Brush street car going north—an open car. When I looked at that car it was about between the center of the city hall and the south end of it—between Fort and Monroe, but nearer Fort. The car was going north while he was falling from it. I was standing right there in front of the German-American Bank, out toward the curbstone. After he fell I walked over there; saw he had his foot smashed—his right foot. Somebody telephoned for the ambulance, and I stayed until it came."

John Kaminski testified for plaintiff:

"I am employed at the American Car & Foundry Company. I know plaintiff. On June 3, 1905, when he was injured, I was on Woodward avenue by the monument there. I was just walking up that way selling papers. The first I saw the plaintiff that morning, I saw him get on the Brush street car there. Before he got on the Brush street car, he was standing there on the corner waiting for a car. The car was going north. It stopped right there on Woodward avenue, between Fort and Michigan. I was standing right at the soldiers' monument at that time. When the car came to a stop, plaintiff was getting on the car. It was an open car. While plaintiff was getting on the car, he fell on his back. He put his foot on the step that runs alongside of the car, and grabbed over there with his hand. After he grabbed the rod with his hand, and put his foot upon the board, the car started to go, and he fell on his back off the car under the wheel on the pavement. His foot went under the wheel."

Defendant called as witnesses the motorman and conductor of the car, its stockkeeper, Cook, and two passengers by the name of Wilcox and Russell, who gave evidence tending to show that plaintiff's accident happened at the corner of Brush street and Gratiot avenue, several blocks distant from the place fixed by plaintiff and his witnesses. Mr. Russell testified:

"I recollect an accident which happened in June, 1905, when I was on a street car, Brush street car. It happened on the Gratiot avenue line near the corner of Brush. I was sitting near the center of the car, I should imagine.

The man was sitting ahead of me. I must have noticed him, but didn't pay any attention to him more than any other passenger. The accident first drew my attention to him. I saw him step from the car. I thought he stepped from the car; it did not appear to me that he fell off. It seemed to me that he got off of his own volition. He certainly fell down. He was on the ground or street or pavement afterwards, after he got off the car.   *   *   *

"Q. Do you think you would know the man, if you saw him again?

"A. No, sir; I do not think I would."

Mr. Wilcox testified:

"I was sitting in the car, an open car, about 8:10 or 8:15 a. m. To the best of my recollection, I was sitting in the forward part of the car, probably the third seat, and there was a man got on the car there, and the car stopped at Brush street, and as the car turned on Gratiot he was sitting on the end seat, and he simply rolled out of the car, so far as I could see, and fell on the pavement, and was picked up and sat back on the car.  *   *   *   He took off his shoe, as I remember it. I did not see his foot bleeding, or anything of that nature. I got off the car at Jefferson avenue. The man was still on the car then. I do not think I would recognize him if I saw him. As to his nationality, I would say that he was either a German or Polish descent. He said something, but I could not make out what he said. It was not English, anyway.  *   *   *   I do not know the dates this occurred, except it was somewhere about June, 1905. I have never seen any other street car accident. When the man took off his shoe, he was about turning onto Monroe avenue.  *   *   *   I remember now, he took his shoe off, and then commenced to take off his sock. That was just a little after the car turned into Monroe avenue. Possibly before he got down to the city hall."

The conductor, Adamson, testified:

"I first saw the man when he got on the car at Gratiot and Brush, when we stopped there to let our passengers off. The car at that time was going south on Brush street. It stops right on Brush, before you get to Gratiot, to take on and let off passengers there, north of Gratiot on Brush. At the time plaintiff got on the car I was on the rear end; saw him get on platform. Well, when we

stopped to let our passengers off, they all got off, and I think that there were two got on, this man and some other man. He got on the front seat, and started to go in to sit down, and I gave the bell to go ahead, and when we started to go around the curve, he got up again and started to get out again, to the outside, going around the curve. I hollered at him to stop, but he got hold of the handle, and as he went around the Gratiot curve, he fell immediately. I gave three bells to stop. the car, and the motorman checked her up, I suppose, in 10 or 15 feet, and we jumped out and picked him up, and put him on the car again, and asked him if he was hurt, and he says, 'Yes, I am hurt.' He got on, and I says, 'We will take you down, and send you to the hospital.' And at the time we got to the city hall, I told the boy who turns the switch, I told him to telephone for an ambulance, this man says he was hurt. At that time I did not know his foot was crushed then, and I asked him if he wanted to get off, and he says, 'No; I do not want to get off here.' I says, 'All right, we will go down to the depot and come back,' and after we got down to the depot, he had his shoe removed, and I saw his toes were all bleeding, and the blood was all running over the platform, and we started up again, and we got him off at the city hall, and we got him off there, and he went over to the curb, and I left him in charge of the switchman, and told him to go to the hospital, his foot was hurt. * * * Now, I could not tell you about the date that this accident did occur, in fact it is so long ago I have forgotten. I never saw the man who was injured the date that I tell about afterwards, that I know of. I don't think I ever saw him from that date up to this; I might have, but I would not know him. * * * I didn't start the car before this man got into his seat. He was just sitting down in the front seat. After my car started he jumps out of the seat and started for the side of the car.''

The witness Cook testified:

"At the time he got on, the car was standing still. He first got on the running board as the car started, and then he stepped into the first bench. As the car entered the curve he attempted to sit down, and then stood up again, and put his hand in his pocket. It seemed to me he was going to take out some change, and, as the car swung out on the main track, lost his balance and fell to the

ground, striking on his right shoulder, and threw his right foot under the wheel. I got off the car and picked him up. The car stopped. * * * He was standing there just as the car struck the curve. He did not have hold of anything at that time. The car went around the curve while he was in that position. As the car struck the straight track, before he got quite seated, he was thrown headlong on the pavement. He tried to grab hold of the handles, and did not succeed in grabbing anything. He went off head first, off the right-hand side of the car. * * * The car did go some distance after he struck the pavement. I didn't think at that time any wheel had gone over his foot. I had no reason to believe any such thing had occurred. * * * I did not have anything to do with him after I picked him up. He was sitting down like any other passenger, and rode away. There were no other people in that seat at that time. There were between 6 and 10 people on the car at that time. * * * This man sat in the front seat like any other passenger, and rode along with me after he got back on.

"*Q.* When did you find out this man had lost four toes off his foot?

"*A.* I read it in the paper that night.

"*Q.* That is the first that you knew of it?

"*A.* Yes, sir. * * *

"*Q.* You could not see this man's foot while you were sitting alongside of him?

"*A.* Yes; I could see his foot, but there were no marks of being run over. I did not see anything to indicate anything wrong with his foot. I had no occasion to think so."

The motorman, Weibel, testified:

" I recollect the accident that happened on the 3d day of June, 1905. It happened on Brush, corner of Gratiot, on Gratiot, corner of Brush. * * * I went slow around the curve, and after I got on the main track, I got three bells to stop, and I stopped the car immediately, and I looked back and saw a man lying on the pavement, and I went back there, and my conductor and a man who works down below, he works here, this man Cook, picked him up, and he walked, and I thought his shoulders were hurt the way he walked. * * * He didn't take his shoe off until after we were coming up the hill.

"*Q*. And then you didn't see his foot at the depot?

"*A*. No, sir.

"*Q*. Not at all?

"*A*. No, sir.

"*Q*. It was after you got away from the depot?

"*A*. Yes, sir. *  *  * When we were coming up, at that hill from the depot, I discovered that he had a foot injured so bad he ought to go to the hospital. *  *  * Up to that time I had not heard any complaint at all from him about his foot."

There is no inherent improbability in the account given by plaintiff and his witnesses as to the place where, and the manner in which, the accident occurred. It is apparent that the most important question of fact in the case was, Where did the accident really occur? Upon this question the witnesses for the respective parties are in irreconcilable conflict, and its determination must depend upon the credit given by the jury to the individual witnesses. There were inconsistencies and contradictions in the testimony of plaintiff's witnesses. There were also inconsistencies and contradictions in the testimony of defendant's witnesses. The credibility of witnesses is a subject peculiarly within the province of the jury, and they evidently believed the plaintiff and his witnesses, and adopted their version of the accident as reliable. The trial judge, who heard the same testimony, declined to hold that their verdict was against the weight of the evidence; and, after a careful consideration of all the testimony, we are of the opinion that such determination was not erroneous.

Error is also assigned upon the refusal to give defendant's third request to charge without qualification. The third request was as follows:

" I charge you that if you find that a witness is telling an untruth about any one point, you may find that the whole of that witness' testimony is not to be believed, and disregard that witness entirely."

To this the court added the following:

"Except it be corroborated by other testimony, but I

will leave the truth of the witnesses' testimony entirely to the jury."

We find no error in this qualification.  *Heddle* v. *Railway Co.*, 112 Mich. 551.

It is further contended that the trial judge erred in charging the jury as follows:

"Now, gentlemen, with your candor, with your training, with your business experience, and with the instruction that you have had here, you are the best 12 men to determine this accident, because of this negligence, as the case may be, of any 12 men in the world, because you have heard more about it, and know the most about it."

In view of the fact that the trial judge repeatedly instructed the jury that the burden of proof was upon the plaintiff, and that he must prove defendant's negligence and his own freedom from negligence by a preponderance of the evidence, we do not think that the jury could have understood the court as intimating to them that defendant's negligence had been established.  *Seeley* v. *Swift & Co.*, 151 Mich. 545.

The judgment is affirmed.

GRANT, C. J., and MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.